**NOT FOR PUBLICATION**                                              [21]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

—————————————————————————
                                              :
UNITED STATES OF AMERICA       :        Criminal No. 06-008 (FLW)
                                              :
             v.                       :                **OPINION**
                                              :
ROBERT McCLAIN,                   :
                                              :
                  Defendant.      :
—————————————————————————:

**WOLFSON, UNITED STATES DISTRICT JUDGE**

Before the Court is a motion by Defendant Robert McClain to suppress incriminating

statements he made to law enforcement officers during an interview at the Cumberland County

Courthouse in Bridgeton, New Jersey.  Defendant asserts that he made the statements at issue

during a custodial interrogation prior to which the officers did not recite the Miranda[1] warnings

to him.  Consequently, Defendant argues that the statements were obtained in violation of the

Fifth Amendment and may not be used against him.  The United States of America ("the

Government") argues that the interview during which Defendant made the incriminating

statements at issue was not a custodial interrogation, and therefore, the officers were under no

obligation to recite the Miranda warnings to Defendant.  Alternatively, the Government asserts

that even if the interview constituted a custodial interrogation, Defendant's statements are

admissible against him because, during an interview two weeks earlier, Defendant knowingly and

intelligently waived his Miranda rights with respect to the later exchange.  For the reasons that

follow, Defendant's motion to suppress is granted.

—————————————————

[1] Miranda v. Arizona, 384 U.S. 436, 461 (1966).

## I.    BACKGROUND

On July 14, 2005, pursuant to a warrant issued by a New Jersey Superior Court judge, a team of officers from the Millville, New Jersey Police Department and agents of the United States Drug Enforcement Administration ("DEA") executed a search of Defendant's apartment at Lakeview Manor Apartments in Millville, and a 1995 Chevrolet Cavalier used by Defendant. See Certification of James M. Kerrigan ("Kerrigan Cert."), submitted as Attachment A to the Criminal Complaint, at ¶ 4.  The search was part of an ongoing investigation into alleged drug dealing by Defendant, which included, among other things, earlier surveillance of Defendant and controlled purchases of crack cocaine by law enforcement officers from Defendant. Id. at ¶ 1-2. During the search, officers recovered certain incriminating evidence, including a digital scale, more than 100 grams of crack cocaine, a small quantity of marijuana, and a .380 caliber hand gun. Id. at ¶¶ 6-7.

On January 4, 2006, a grand jury returned an Indictment that charged Defendant with certain criminal offenses.  On February 11, 2006, Defendant filed an omnibus pre-trial motion that included a motion to suppress incriminating statements he made to police shortly after his arrest.  On February 22, 2006, the grand jury returned a Superceding Indictment that charged Defendant with: (1) knowingly and intentionally possessing with intent to distribute more than fifty grams of cocaine base in violation of 21 U.S.C. § 2; (2) knowingly possessing a firearm in violation of 18 U.S.C. § 922(g)(1)(2); and (3) knowingly possessing a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 922(c)(1)(A)(I).  On March 30, 2006, Defendant filed a motion to bifurcate, which was later resolved by stipulation between the parties.  On April 25, 2006, the Government filed a motion in limine regarding the admissibility of certain evidence at

2

trial, which was also resolved by the parties.  On May 3, 2006, the Court held oral arguments on the various motions and heard testimony from which the following factual recitation is drawn.

Defendant was arrested during the course of the July 14, 2005 search of his apartment and automobile.  He was given the Miranda warnings by Detective Michael Donato while still at the scene, and signed an acknowledgment form verifying that he had received such warnings. See T1:71-73, 113.[2]  Thereafter, Defendant was transported by Detective Rick Pierce and another detective to the Bridgeton Police Department. Id. at 77.  After they arrived, Pierce recited the Miranda warnings to Defendant, who signed a second acknowledgment form. Id. at 26-27. Pierce then questioned Defendant for thirty to forty-five minutes regarding an unrelated homicide Pierce was investigating. Id. at 26, 31-33.  Defendant denied any knowledge of the homicide, but when Pierce asked about the search of Defendant's apartment and car that day, Defendant admitted ownership of the drugs and gun discovered by the police. Id. at 33.  At that point, Pierce left the interview room and found Donato, who had returned to the station house, and the two continued to question Defendant about the search that day. Id. at 34, 59.

Defendant admitted to Pierce and Donato that he had purchased the drugs found during the search and told them from whom he had purchased them. Id. at 80.  Defendant also talked about how he had begun to sell drugs again, discussed the handgun discovered by police and his reasons for purchasing it, and explained how he had come to possess the 1995 Chevrolet Cavalier. Id.  Donato testified that Defendant acknowledged "he was in a lot of trouble for the

---

[2] "T1" refers to the transcript of May 3, 2006 oral argument on Defendant's first motion to suppress.  On May 23, 2006, the Court heard oral argument on this motion, Defendant's second motion to suppress, the transcript of which is referred to hereinafter as "T2."

items . . . recovered, and he wanted to cooperate."[3] Id.  Donato and Pierce indicated that although they could not guarantee anything, it was possible for Defendant to receive a benefit for cooperating with their investigation.[4] Id.  The interview ended with Donato telling Defendant that he would "see him at a later date." Id.

After oral argument on May 3, 2006, I found that Defendant knowingly and intelligently waived his Miranda rights on July 14, 2005, and voluntarily made incriminating statements to Pierce and Donato. T1:117.  Accordingly, I denied his first suppression motion. Id.

On May 9, 2006, Defendant filed this second motion in which he seeks suppression of statements he made to Donato and DEA Agent James M. Kerrigan during their July 26, 2005 interview of him at the Cumberland County Courthouse in Bridgeton, New Jersey.  On May 23, 2006, I held oral argument on Defendant's motion, during which Donato and Kerrigan testified. The following facts are drawn from their testimony.

After Defendant's arrest, he was detained at the Cumberland County Jail. T2:19.  On July 26, 2005, Donato arranged with Cumberland County Jail authorities to have Defendant brought to a private interview room at the Cumberland County Courthouse "to interview [Defendant] and talk to him about cooperation." Id. at 4-5.  Later that day, Cumberland County jail personnel escorted Defendant, who had not been informed of the purpose of his trip, to an interview room in the Cumberland County Courthouse where Donato and Kerrigan were waiting for him. Id. at

---

[3] Donato also testified that he did not record Defendant's alleged offer to cooperate in the police report he later filed, and that his testimony relating to that comment was made from memory. T2:24-25.

[4] Donato later agreed that "there was no indication as to how the word 'cooperation' was being defined, whether [Defendant] would go out and get additional information or just give [Donato] information about his own arrest." T2:18.

4

21-22.  Kerrigan agreed that he and Donato went to meet with Defendant "to give him the opportunity before a federal complaint was filed to cooperate . . . [a]nd to possibly be released on bail."  Id. at 27.  Kerrigan testified that neither he nor Donato informed Defendant that the sole purpose of the interview was to determine the scope of Defendant's willingness to cooperate.  Id. at 41, 46-47.

At the outset of the interview, Kerrigan asked Defendant if he was represented by counsel. Id. at 6.  Defendant responded that he had not yet applied for an attorney, nor had one been assigned to him. Id.  Kerrigan then explained to Defendant that his case had been accepted for prosecution by the Government, under federal criminal law, and that Kerrigan had come "to talk to [Defendant] to see if [Defendant] was still willing to cooperate with [the Government]." Id.  Kerrigan informed Defendant that if he were convicted under federal law he faced a substantially longer prison sentence than if he were convicted under state law. [5] Id. at 27.  After explaining what cooperation might entail, Donato also discussed with Defendant the possibility of relocating Defendant and his family after such cooperation, to ensure their safety. Id. at 6-8. Donato testified that Defendant declined to cooperate and said: "I really don't want to be a rat. That's not what I'm all about." Id. at 29.

Both Donato and Kerrigan testified that after Defendant declined to cooperate, he began to discuss voluntarily the events of July 14, 2005, and admitted that he had been selling drugs because he was unemployed, and that the 1995 Chevrolet Cavalier he had been using belonged to a friend who had loaned it to him while in prison. Id. at 32, 51.  Donato and Kerrigan gave

---

[5] There is some discrepancy between the testimony of Donato and Kerrigan regarding whether Defendant was told his case had been accepted for federal prosecution and what that might mean in terms of sentencing before or after his potential cooperation was discussed. Compare T2:27-28 with T2:55-56.

conflicting testimony with regard to how much time Defendant spent discussing facts relevant to the drugs and gun found during the July 14, 2005 search.  Donato testified that Defendant's disclosure of the information in question occurred during the final ten minutes of the thirty-five to forty-five minute interview. Id. at 42-43.  However, Kerrigan testified that he and Donato discussed the possibility of Defendant's cooperation for about ten minutes, and that Defendant spent about ten minutes "right about in the middle" of the thirty-five to forty-five minute interview making the incriminating statements at issue. Id. at 63-64.  During the interview, neither Donato nor Kerrigan ever recited the Miranda warnings to Defendant. Id. at 22, 52.  Nor did Donato or Kerrigan remind Defendant of the Miranda warnings as read to him two weeks earlier, on July 14, 2005. Id. at 33.  Donato testified that at the end of the meeting he advised Defendant that "it was in his best interest to ... seek the advice of an attorney." Id. at 10.  He testified that he did so because Defendant seemed not to "understand, appreciate or believe what [Donato] was saying." T2:13.

At the conclusion of oral argument on May 23, 2006, I ordered the parties to provide additional written briefing in support of their respective arguments.  Specifically, I requested that the parties focus on: (1) whether the July 26, 2005 interview of by Donato and Kerrigan at the Cumberland County Courthouse constituted a custodial interrogation requiring that Defendant be given the Miranda warnings; and (2) whether the July 14, 2005 waivers Defendant executed after his arrest, coupled with his alleged desire to cooperate with law enforcement, obviated the need to repeat the Miranda warnings to him on July 26, 2005, or whether those earlier waivers were stale by the time of the July 26, 2005 interview, and thus ineffective. Id. at 78-82.  The parties timely submitted supplemental briefs as directed.

6

For the reasons discussed more fully below, I find that the manner, conduct, and extent of the July 26, 2005 interview were reasonably likely to evoke incriminating responses from Defendant and, therefore, the interview constituted a custodial interrogation. Accordingly, Defendant should have been given the <u>Miranda</u> warnings before the interview began. Additionally, I reject the Government's argument that Defendant's July 14, 2005 waivers, and his alleged desire to cooperate with the police, somehow relieved Donato and Kerrigan of the obligation to recite the <u>Miranda</u> warnings to him before the July 26, 2005 interview. The passage of nearly two weeks between the interrogations and the investigators' failure to remind Defendant of his earlier waivers during the subsequent interview, rendered those earlier waivers stale, and incapable of protecting Defendant's constitutional rights. Consequently, Defendant's motion to suppress the incriminating statements he made to Donato and Kerrigan during the July 26, 2005 interview is granted.

## II.    DISCUSSION

### A.    <u>Miranda</u> and Custodial Interrogation

The Fifth Amendment provides that no "person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. 5, § 3. In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Supreme Court emphasized that the privilege against self-incrimination protects individuals both from legal compulsion to testify in a criminal courtroom and from "informal compulsion exerted by law-enforcement officers during in-custody questioning." <u>Id.</u> at 461. Consequently, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." <u>Id.</u> at

444.

To counteract the inherent coercive effect of a custodial interrogation and the reality that a suspect "will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess," Illinois v. Perkins, 496 U.S. 292, 296-97 (1990), the Supreme Court requires law enforcement agents to recite a list of procedural safeguards to criminal suspects prior to questioning.[6] Miranda 384 U.S. at 479.  Those warnings have come to be familiarly recognized as the Miranda warnings and inform a criminal suspect "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."[7] Id. at 479.  Generally, any statement made by a suspect in response to custodial interrogation without the benefit of the Miranda warnings, or after the suspect has elected to remain silent, or indicated a desire to speak to an attorney, is inadmissible against that suspect at trial. Id. at 478-479.

The Supreme Court has explained that a custodial interrogation includes "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 444.  However, the definition of "custodial interrogation" has not been strictly limited to express questioning.  In Rhode Island v.

---

[6] "The concern of the Court in Miranda was that the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." Rhode Island v. Innis, 446 U.S. 291, 299 (1980) (citations omitted).

[7] Essentially, "[t]he Miranda warnings are intended to 'warn' a suspect that the police have interests that are antagonistic to his, and that they can use anything he says against him in court." United States v. Mesa, 638 F.2d 582, 588 n.5 (3d Cir. 1988).

Innis, the Supreme Court acknowledged that no express questioning of the defendant had taken place, but held:

> the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect . . . focus[ing] primarily upon the perceptions of the suspect, rather than the intent of the police.[8]

446 U.S. 291, 301 (1980).[9]  The Court explained that "[t]o limit the ambit of Miranda to express questioning would 'place a premium on the ingenuity of the police to devise methods of indirect interrogation, rather than to implement the plain mandate of Miranda." Id. at 299 n.3  (quoting Commonwealth v. Hamilton, 445 Pa. 292, 297 (Pa. 1971)).  The Court limited its holding by noting that "the police surely cannot be held accountable for the unforeseeable results of their words or actions, [therefore] the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." Id. at 301-02.

In Innis, the defendant was arrested and given the Miranda warnings before invoking his right to an attorney. Id. at 294.  While transporting the defendant to the police department, officers began to discuss the shotgun used in the crimes for which the defendant was a suspect. Id. at 294.  One of the officers noted that a school for handicapped children was located in the

---

[8] While the focus rests on the suspect's perceptions, the intent of a police officer is nonetheless relevant and may bear on the question of "whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response." Innis, 446 U.S. at 301 n.7. Additionally, "[a]ny knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining [what] the police should have known." Id. at 301 n.8.

[9] See also Illinois v. Perkins, 496 U.S. 292, 296 (1990) (stating '[c]oercion is determined from the perspective of the suspect").

area and stated, "God forbid one of them might find a weapon with shells and . . . hurt themselves," to which the other officer expressed agreement. Id. at 294-295. At that point the defendant interrupted the officers and told them to turn the car around so he could show them where he had hidden the shotgun. Id. at 295.

Later, the defendant moved to suppress evidence obtained as a result of his statements to the police during the car ride, arguing that the officers' conversation constituted an interrogation in violation of his invoked right to an attorney. Id. The trial court admitted the evidence against the defendant and he was convicted of the various charges against him. Id. at 296. The Supreme Court of Rhode Island concluded that both the shotgun and testimony relating to its discovery were obtained in violation of Miranda because the officers had subjected the defendant to "subtle coercion" that was the equivalent of "interrogation" within the meaning of Miranda after he had invoked his right to counsel, and that he had not subsequently waived his rights. Id. The court ordered Defendant's conviction vacated and granted his request for a new trial. Id. at 297.

The United States Supreme Court concluded that the defendant was not "interrogated" within the meaning of Miranda, and reversed.[10] Id. at 302. The Court noted that the defendant

---

[10] Writing for the Court, Justice Stewart summarized:

The case thus boils down to whether, in the context of a brief conversation, the officers should have known that the [defendant] would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of no more than a few off hand remarks, we cannot say that the officers should have known that it was reasonably likely that [the defendant] would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly "evocative." It is our view, therefore, that the respondent was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him.

Innis, 446 U.S. at 302.

was in custody at the time in question but found that the conversation between the two police officers in the patrol car was "nothing more than a dialogue between the two officers to which no response from the respondent was invited." Id.  Moreover, the Court concluded that the defendant had not been subjected to the "functional equivalent" of questioning because neither officer could have foreseen "that their conversation was reasonably likely to elicit an incriminating response from the [defendant]." Id.  The Court found nothing in the record "to suggest that the officers were aware that the [defendant] was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children," nor anything "to suggest that the police knew that the [defendant] was unusually disoriented or upset at the time of his arrest." Id. at 302-03.

The Supreme Court again addressed the scope of a custodial interrogation in Arizona v. Mauro, 481 U.S. 520 (1987).  In Mauro the defendant was taken into custody on suspicion of having murdered his son. Id. at 522.  The police read the defendant the Miranda warnings and ceased questioning him after he invoked his right to counsel. Id.  However, the police allowed the defendant's wife to speak with him in the presence of an officer who recorded their conversation using a recording device in plain sight. Id.  The wife expressed despair to the defendant, who, in response, advised her not to answer any questions until a lawyer was present. Id.  At trial, the prosecution used the tape to rebut the defendant's insanity defense. Id. at 523.

The defendant sought to suppress the recording, and argued it was "a product of police interrogation in violation of his Miranda rights." Id.  The trial court admitted the evidence and the defendant was convicted and sentenced to death. Id.  Relying on Innis, the Arizona Supreme Court reversed, noting that the police admitted that they knew it was "possible" the defendant

11

might make incriminating statements if he saw his wife and concluding the police had interrogated him within the meaning of <u>Miranda</u>. <u>Id.</u>  The United States Supreme Court reversed, and held that "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." <u>Id.</u> at 530.  The Court emphasized that only statements given by an individual in custody who has been "subjected to compelling influences, psychological ploys, or direct questioning" will be considered the product of custodial interrogation. <u>Id.</u>

The Third Circuit has consistently held that "'custodial interrogation' is not susceptible of an exact definition; thus the determination whether statements are the product of such 'custodial interrogation' must be made on a case-by-case basis." <u>United States v. Mesa</u>, 638 F.2d 582, 584 (3d Cir. 1988); <u>see also</u> <u>Steigler v. Anderson</u>, 49 F.2d 793, 799 (3d Cir. 1974); <u>United States v. Clark</u>, F.2d 827, 832 (3d Cir. 1970).  In determining whether a specific instance constitutes an interrogation within the meaning of <u>Miranda</u> or <u>Innis</u>, the Third Circuit places an emphasis on the manner and context in which the words or actions of law enforcement officers are made. <u>See, e.g.</u>, <u>United States v. Oppong</u>, 165 Fed. Appx. 155, 160 (3d Cir. 2006).

In this case, the Government argues first that the July 26, 2005 interview of Defendant cannot be considered an interrogation because Defendant, rather than the officers, initiated the meeting when he agreed to cooperate with law enforcement at the conclusion of his July 14, 2005 interview.  According to the Government, because Defendant initiated the July 26, 2005 interview, he must be assumed to have waived his rights and any statements he made during its course must be considered to have been given freely and voluntarily.  As a result, the Government asserts no <u>Miranda</u> warning was required.  I disagree.

A defendant may waive the rights discussed in the <u>Miranda</u> warnings if the waiver is made knowingly, intelligently, and voluntarily. <u>United States v. Pruden</u>, 398 F.3d 214, 246 (3d Cir. 2005).  Two factors affect this determination:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude the <u>Miranda</u> rights have been waived.

<u>Id.</u> (citing <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)).

Here, there is no direct support in the record for the proposition that Defendant "initiated" the July 26, 2005 meeting.  Neither Donato nor any other officer on the scene on July 14, 2005, memorialized Defendant's alleged expression of interest in cooperating with police in a report. Further, both Donato and Kerrigan testified that Defendant was wholly unaware of the July 26, 2005 meeting until they walked through the door of the interview room at the Cumberland County Courthouse and began to talk to him.  Indeed, the argument that Donato and Kerrigan were merely following up on Defendant's alleged agreement, two weeks earlier, to cooperate with their investigation simply strains credulity.  Even assuming Defendant agreed to cooperate with the police on July 14, 2005, that agreement is, at best, only tenuously linked to the July 26, 2005 interview and, in any event, cannot be construed as a deliberate, knowing, and intelligent waiver by Defendant of all of his rights going forward.  Accordingly, I find that the July 26, 2005 interview was not "initiated" by Defendant, and that any agreement by Defendant on July 14, 2005 to cooperate with police did not obviate the need for the <u>Miranda</u> warnings during the July

26, 2005 interview, if such warnings were required under the circumstances.  I now consider the question of whether the March 26, 2005 interview constituted an interrogation requiring the <u>Miranda</u> warnings.

The Government argues that Donato and Kerrigan were not required to give Defendant the <u>Miranda</u> warnings before the July 26, 2005 interview because the interview was conducted solely for the purpose of determining the scope of Defendant's willingness to cooperate with their investigation and did not include any questions about his involvement in the crimes about which he made incriminating statements.  Defendant argues that even in the absence of any affirmative questions by Donato or Kerrigan about the July 14, 2005 search, the July 26, 2005 interview constituted an interrogation.  He asserts that Donato and Kerrigan should have known that their unscheduled meeting with him, during which they informed him of the harsher penalties to which he was exposed under federal law and "pressured" him to cooperate with their investigation, would elicit incriminating statements from him.  Moreover, Defendant claims he made the incriminating statements at issue under the coercion of the conditions of the interview and the conduct of Donato and Kerrigan.

At the outset, I note that the July 26, 2005 interview took place at the Cumberland County Courthouse, while Defendant was detained in the Cumberland County Jail.  Accordingly, there is no question that Defendant was in custody for purposes of <u>Miranda</u>.  Thus, Defendant's motion turns on whether the conduct and manner of the interview were such that Donato and Kerrigan should have expected Defendant to make incriminating statements, that is, whether the interview was the functional equivalent of an interrogation.  I find that Donato and Kerrigan's discussion of the substantially increased penalties to which Defendant was exposed under federal law, together

14

with their lengthy conversation with him after he refused early in the conversation to cooperate in the manner they suggested, created an atmosphere in which it was foreseeable that Defendant would make incriminating statements.

The Government argues that the fact that Donato and Kerrigan informed Defendant of the heightened penalties available under federal law, alone, is insufficient to convert the July 26, 2005 interview into the functional equivalent of an interrogation.  In support of that argument it relies on Oppong, Easley v. Frey, 433 F.3d 969, 973-74 (7th Cir. 2006), and United States v. Payne, 954 F.2d 199 (4th Cir. 1992).  However, each of those cases is factually distinct from this case.

In Oppong, the defendant was arrested and  placed in a holding cell where two agents visited him and advised him, in detail, of the charges against him, the evidence implicating him, and of potential penalties, and allegedly told him to think about what he had been told. 165 Fed. Appx. at 159.  Approximately two hours later, the agents re-entered the defendant's cell and read the defendant the Miranda warnings, at which point he signed a waiver and gave a statement. Id. The trial court denied the defendant's motion to suppress his statement, and held that the procedure was not the functional equivalent of an interrogation. Id. at 160.  The Third Circuit affirmed and explained: "keeping a suspect informed of the progress of the investigation and the status of the charges against him should be encouraged rather than discouraged, so long as the communication is truthful, and is not designed, nor is it likely to elicit, an incriminating response." Id. (citing United States v. Allen, 247 F.3d 741, 765-66 (8th Cir. 2001)).

In Easly, a law enforcement officer confronted the defendant -- who was in custody, had

been given the Miranda warnings, and had invoked his right to remain silent -- and stated: "I understand you have been given your rights and you don't wish to say anything, and I do not wish to ask you any questions at this time, but I want to advise[] you [of] what lies ahead." 433 F.3d at 971.  After the officer informed the defendant of the evidence against him and the capital nature of the potential charge against him, the defendant blurted out a confession which he later moved to suppress, arguing that the officer's statement was the equivalent of interrogation. Id. The Seventh Circuit held that the officer's statements did not constitute interrogation as a matter of law. Id. at 973-974.  Specifically, the Seventh Circuit stated:

> We do not believe that [the officer's] statement regarding the evidence and the possible consequences of the charges [the defendant] faced rose to the level of interrogation under existing United States Supreme Court precedent . . . . [W]e do not believe that the provision of information, even if its weight might move a suspect to speak, amounts to an impermissible "psychological ploy" . . . . [The defendant] has not suggested that [the officer's] statement was anything more than a matter-of-fact communication of the evidence against him and the potential punishment he faced .... And because it was not a form of interrogation, the statement did not transgress the investigators' duty to honor [the defendant's] invocation of his right to remain silent.

Id.

Finally, in Payne, the defendant was in custody and read the Miranda warnings, after which he invoked his right to counsel. 954 F.2d at 201.  While the defendant was being transported to a field office by two FBI agents, one of the agents received a call that a gun had been found in the defendant's house. Id.  After hanging up the phone the agent told the defendant: "They found a gun at your house." Id.  The defendant responded, "I just had it for my protection," and later moved to suppress this statement arguing that it was the result of interrogation. Id.  The Fourth Circuit affirmed the trial court's admission of the defendant's

statement into evidence, and explained that the officer's statement "was not one that sought or required a response," and that the officer could not have reasonably foreseen that his statement was likely to elicit an incriminating response. Id. at 203.

Unlike Oppong, Easley, and Payne, in this case, Defendant was not given the Miranda warnings immediately before, during, or after the July 26, 2005 interview.  Also, Donato and Kerrigan both conceded that they did not advise Defendant of the purpose of the July 26, 2005 interview.  Further, instead of a simple report of the possible charges and penalties Defendant faced, as was delivered in Oppong and Easley, here, Kerrigan informed Defendant of an increase in the charges and possible penalties confronting Defendant, and testified that he intended to use that information to motivate Defendant to cooperation in an investigation of other crimes.  Moreover, the extent of the discussion between Defendant and Donato and Kerrigan, in this case, far exceed the brief comments that elicited the incriminating responses in Oppong, Easley, and Payne, as well as those in Innis and Mauro.  Indeed, in this case, Donato and Kerrigan interviewed Defendant for nearly an hour and, while testifying neither could accurately recall what was discussed during large sections of that time.  To be sure, if the only purpose of their interview of Defendant was to gauge the scope of his willingness to cooperate, Donato and Kerrigan should have terminated the interview after Defendant's refusal to cooperate, which, according to Kerrigan, came within the first ten minutes of the interview.  Instead, Kerrigan testified that the interview continued for thirty-five more minutes, during which time Defendant made incriminating statements while trying to explain his alleged criminal actions.

17

Although Donato and Kerrigan may not have intended to compel Defendant to make any incriminating statements during the July 26, 2005 interview, I find that, under the totality of the circumstances, it was reasonably foreseeable that the manner, conduct, and extent of the interview was likely to elicit such statements. Consequently, I conclude that the interview constituted an interrogation within the meaning of Innis, and Donato or Kerrigan should have recited the Miranda warnings to Defendant.

**B.     Staleness of Earlier Miranda Warnings**

Finally, the Government argues that even if the July 26, 2005 interview constituted an interrogation requiring the Miranda warnings, Defendant's signed, knowing and intelligent waivers of his rights on July 14, 2006 apply to the July 26, 2005 interview, and there was no need to re-warn him. Defendant argues that the passage of nearly two weeks between his July 14, 2005 waivers and the July 26, 2005 interview render the earlier waivers stale and ineffective.

As set forth above, a defendant may only waive the rights referred to in the Miranda warnings if the waiver is made knowingly, intelligently, and voluntarily. Miranda, 384 U.S. at 444. Once a suspect waives his rights, Miranda does not necessarily require that he be warned anew each time he is questioned. See United States v. Pruden, 398 F.3d 241, 246 (3d Cir. 2005) (citing Guam v. Dela Pena, 72 F.3d 767, 769-70 (9th Cir.1995)). To determine whether a suspect must be re-warned of his Miranda rights when questioning resumes after a lapse of time, the Third Circuit has adopted the following standard:

> the question of whether a time lapse renders Miranda warnings "stale" may be reduced to answering two questions: (1) At the time the Miranda warnings were provided, did the defendant know and understand his rights? (2) Did anything occur between the warnings and the statement, whether the passage of time or other intervening event, which rendered

18

the defendant unable to consider fully and properly the effect of an exercise or waiver of those rights before making a statement to law enforcement officers?

Pruden, 398 F.3d at 246-47 (quoting United States v. Vasquez, 889 F. Supp. 171, 177 (M.D. Pa. 1995)).  Among the specific factors the Third Circuit considers are: the length of any interruption in the continuity of an interview, a change in location, a change in the identity of the questioning officer, and the degree to which a suspect's new statements differ from previous statements. See Pruden, 398 F.3d at 247-48.  Notably, in Pruden, the Third Circuit commented that the twenty-hour interruption in questioning in the case before it seemed "to be at the upper end of the permissible range." Pruden, 398 F.3d at 247.

The Government relies heavily on United States v. Colon, 2000 WL 388728, *8 (E.D. Pa. April 14, 2000) for the proposition that "[i]f, in the totality of the circumstances, a suspect knowingly, intelligently, and voluntarily waives his Fifth Amendment rights, a significant lapse of time between the Miranda warnings and the questioning of the suspect will not invalidate the suspect's waiver."  Accordingly, the Government argues that the knowing, intelligent, and voluntary waivers executed by Defendant on July 14, 2005, remained valid on July 26, 2005, notwithstanding the twelve-day lapse in time.  In addition, the Government asserts that, as in Colon, in this case, Defendant's previous experience with the criminal justice system afforded him a developed understanding of his rights, providing additional insulation from any potentially detrimental effect of the interruption in questioning.

This case is distinct from Colon in several key respects.  First, the defendant in Colon invoked his right to remain silent during an interview that took place after the meeting in question and in which he was not re-read his rights, thus indicating that he understood and

19

intentionally waived those right during the interview at issue. Id. at *9.  In this case, there is no similar indication of Defendant's understanding of his Miranda rights.[11]  Second, the defendant in Colon received Miranda warnings on four separate dates prior to the interview in question. Id. Here, while Defendant was twice read the Miranda warnings, the two recitations occurred within several hours of each other, on July 14, 2005.  Third, during the interview at issue in Colon the defendant insisted on cooperating and providing information to the police "as he had done in the past." Id.  By contrast, in this case, Defendant flatly refused Donato and Kerrigan's  invitation to cooperate during the July 26, 2005 interview, and made incriminating statements only after they continued to engage him in a discussion they testified was aimed only at determining the scope of his willingness to cooperate.  Finally, and most importantly, Colon, an unpublished district court case, was decided prior to Pruden and based on a more lenient standard.  Indeed, the court in Colon did not consider a ten-day lapse in time between the issue of Miranda warnings and the interview in question lengthy enough to require a re-reading of the Miranda warnings to the defendant, id., while in Pruden the Third Circuit described the twenty-hour interruption in questioning before it as "at the upper end of the permissible range." Pruden, 398 F.3d at 247.[12]

_____

[11] The Government argues that Defendant demonstrated knowledge of his rights when he responded that he "had not applied for" an attorney after Kerrigan asked if he was represented by counsel on July 26, 2005.  However, the fact that Defendant had not yet applied for an attorney could also suggest that he lacked a complete understanding of his right to an attorney.  Furthermore, the right to remain silent under the Fifth Amendment, at issue in the case at hand, and the right to an attorney pursuant to the Sixth Amendment are separate rights such that knowledge of one does not necessarily indicate an understanding of the other.

[12] The Government argues that the Third Circuit's characterization of the twenty-hour delay in Pruden is merely descriptive.  That is, the Government asserts that the Third Circuit meant only to place the twenty-hour delay before it on a continuum with the three-hour and fifteen-hour delays in the two cases discussed in its opinion.  Accordingly, the Government argues that the characterization cannot be construed as a binding limit, and cites several cases in which other circuits considered and upheld lengthier delays, including: Biddy v. Diamond, 516 F.2d 118, 122 (5th Cir. 1975) (statements made

I find that the totality of circumstances in this case make clear that Defendant's July 14 2005 waivers were stale by July 26, 2005.  There is no conclusive indication that Defendant understood his right to remain silent on July 26, 2005.  Further, not only was there an interruption of twelve days in the questioning of Defendant, the identity of the questioners also changed from Donato and Pierce on July 14, 2005, to Donato and Kerrigan on July 26, 2005.  Although one of the questioners, Donanto, remained consistent, he did not refer Defendant back to his earlier waivers or remind Defendant of his rights.  Such a reminder, or a re-reading of the Miranda warnings in total, was made all the more necessary by the intervening change in Defendant's understanding of the more serious penalties he faced under federal law on July 26, 2005, as compared to those he believed he faced under state law on July 14, 2005.  While Defendant's July 26, 2005 statements did not add much new information to that already obtained by investigators on July 14, 2005, the circumstances of the interview required that Defendant be re-warned of his rights.  Accordingly, because I find that Defendant's July 14, 2005 waivers of his right to remain silent was stale on July 26, 2005, and he was not re-read the Miranda warnings, his statements made during the latter interview must be suppressed.

---

approximately two weeks after defendant was advised of Miranda rights were deemed voluntary); United States v. Daulton, 488 F.2d 524, 525 (5th Cir. 1973) (Miranda warnings given thirteen days prior to confession were sufficient when court concluded defendant was still "aware of his entitlement to counsel"); Martin v. Wainright, 770 F.2d 918, 929-31 (11th Cir. 1985) (holding admissible a statement made seven days after the full set of warnings were given); Maguire v. United States, 396 F.2d 327, 331 (9th Cir. 1968), cert. denied, 393 U.S. 1099 (1969) (upholding Miranda warnings given three days prior to questioning at issue); United States v. Clay, 408 F.3d 214, 222 5th Cir. 2005) (statement given two days after Miranda warning was upheld, citing cases).  I note that each of the cases the Government cites was decided by another circuit and before Pruden.  Nevertheless, I leave the precise meaning of the "upper-range" description in Pruden to interpretation by the Third Circuit, and I decide this motion on the basis of the specific test and various relevant factors enumerated in Pruden.

**IV.      CONCLUSION**

For the reasons set forth above, Defendant's motion to suppress the incriminating statements he made during the July 26, 2005 interview is granted.

An appropriate Order shall follow.

/s/ Freda L. Wolson
The Honorable Freda L. Wolfson
United States District Judge

Date: August 16, 2006.

22